A96A2440. JEFFERSON INSURANCE COMPANY OF NEW YORK
v. DUNN.
(482 SE2d 383)

McMURRAY, Presiding Judge.

The following chronology is relevant to this appeal from the judgment awarding to plaintiff Charles Adrian Dunn $1.5 million compensatory damages and a total of $3 million punitive damages, based on a jury's special verdict finding against defendant Overground Atlanta, Inc. ("Overground"), and its insurer, defendant Jefferson Insurance Company of New York ("Jefferson"), for conduct seeking to defeat plaintiff from any likely satisfaction of a prior million dollar judgment against Overground: On November 2, 1982, plaintiff sustained permanent brain damage as a result of being brutally beaten by the manager of the Jolly Fox Lounge, which tavern was owned and operated by Overground. Overground was insured under a liability policy issued by Jefferson, with policy limits of $50,000. This policy promised Overground that Jefferson had "the right and duty to defend any suit against the insured seeking damages on account of . . . bodily injury[, . . .] even if any of the allegations of the suit are groundless, false or fraudulent. . . ."

Plaintiff brought an action against the Jolly Fox (Overground) for his personal injuries and offered to settle before trial for the $50,000 limits of coverage under Jefferson's policy. The complaint was forwarded to Jefferson with instructions to "[p]lease handle as quickly as possible." Overground "direct[ed] the insurance company [Jefferson] to settle for the policy limits," but Jefferson refused to settle and further refused to defend its insured, relying on an "Assault and/or Battery Exclusion Endorsement," to deny coverage.

Overground ultimately retained its own counsel. For aught that appears of record, Jefferson issued no pre-trial reservation of rights; in any event Jefferson never sought a judicial declaration of its rights and duties under the liability policy. As late as February 24, 1987, plaintiff's counsel offered to settle for the $50,000 policy limits while contending that Jefferson could be liable for any excess judgment based upon its refusal to settle.

The personal injury case proceeded to trial and resulted in a jury verdict and a March 18, 1987 judgment awarding plaintiff $250,000 compensatory damages and $750,000 punitive damages on the bases of "negligence, false imprisonment and malicious prosecution. . . ." Only after judgment against its insured did Jefferson retain separate counsel to pursue an appeal in Overground's name, after being informed that "Overground Atlanta, Inc. is in fact a defunct corporation [which] does not have the funds or intention of appealing from the judgment." As early as April 10, 1987, counsel for Jefferson was concerned that plaintiff and Overground would try to " 'set up' " and " 'sand bag' " the insurer over the million dollar judgment. In late January 1988, as the notice of appeal was being prepared, the insurer contemplated "negotiating some settlement of any exposure under the policy direct[ly with counsel for Overground]. By June 1988, the insurer expressly contemplated that Overground would "execute a policy release . . . by virtue of [Jefferson] paying some nominal amount [. . . such as unpaid] attorney's fees and/or expenses in connection with this litigation."

The judgment against Overground was affirmed by a majority of this Court on March 31, 1989. *Overground Atlanta v. Dunn*, 191 Ga. App. 188 (381 SE2d 137). There, the whole court held that the jury's verdict that Overground was independently negligent was authorized on the theory of direct liability for negligent supervision of its employee. Id. at 190 (1), 191. Overground's application for certiorari was denied. Id. at 923.

On July 5, 1989, Overground entered into a "RELEASE AND SETTLEMENT AGREEMENT" with Jefferson. In exchange for $5,500, representing unpaid attorney fees owed to Overground's retained counsel, Overground released Jefferson from any and all claims of every character "under Policy No. L137830, . . . arising from or in any way relating to an incident which occurred on or about November 2, 1982 at THE JOLLY FOX LOUNGE and any events subsequent thereto involving [plaintiff] CHARLES ADRIAN DUNN, the [tort] case [against Overground . . .], or the judgment entered against OVERGROUND ATLANTA, INC." This represented a "full and final compromise of doubtful and disputed claims," including any potential claim against Jefferson for any alleged negligent or bad faith refusal to defend the underlying tort action to the detriment of

its insured.

On July 2, 1992, plaintiff Dunn commenced the instant action against Jefferson, Overground, and Overground's counsel. This complaint alleged that the release and settlement agreement entered into when Overground as a judgment debtor was insolvent amounted to a fraudulent conveyance of Overground's sole remaining asset, to the detriment of plaintiff as a judgment creditor. The complaint specifically alleged that Jefferson "obtained The Release from Overground, . . . its officers, directors and attorney, with the intention to delay or defraud [plaintiff] Mr. Dunn of full satisfaction of his judgment for $1,000,000 plus interest and costs." It was further alleged that the release was obtained in "bad faith" and in violation of OCGA § 18-2-22. The complaint also alleged a conspiracy, i.e., a "positive or tacit mutual understanding to defraud [plaintiff] Mr. Dunn . . ." out of the proceeds of the policy and the value of Overground's claim against its insurer.

Overground never answered this second suit and was held in default. Jefferson denied the material allegations, admitting only that it knew of plaintiff's claim against Overground as of February 9, 1983; that it did not accept plaintiff's pre-trial offers to settle for the policy limits of $50,000; and that its attorneys drafted the release and settlement agreement. Overground's own trial counsel, an original party defendant, was released without prejudice before trial.

In support of his claims of conspiracy and fraudulent conveyance, plaintiff introduced post-judgment documents and correspondence written by Jefferson's attorneys and claims managers, indicating that Jefferson's agents knew that Overground's potential claim against Jefferson for bad faith refusal to defend or settle within the policy limits constituted Overground's only real asset. Consequently, Jefferson undertook to obtain the release and assignment of any such claim from its insured lest Overground assign the bad faith claim to plaintiff, the judgment creditor. Jefferson was advised that counsel was attempting to obtain the release upon payment of a "nominal figure," and that counsel for Overground was being coached to opine that Jefferson's policy afforded no coverage or else that any exposure was capped by the $50,000 policy limits. Plaintiff's Exhibit 82, the handwritten notes of William Everding, reveal Jefferson's institutional perspective: "A policy release does *not* protect *us from the plaintiff.* . . . Our [Jefferson's] taking a policy release in exchange for $5,500 'legal bills' would not look too good and might buy us too much trouble by reducing our present 'White Hat' status to one of a combination member who was attempting to bypass the legal process by disapating [sic] the Insured's asset (Our Policy) after the judgment." (Emphasis in original.) Counsel was then instructed to inquire whether the "Insured [would] agree not to sue us in bad faith

or not assign his rights to the plaintiff if we pay the attorney's fees?'"

Answering special interrogatories, the jury found that plaintiff was entitled to $1.5 million in compensatory damages and further found, by clear and convincing evidence, that both Overground and Jefferson should be liable for punitive damages. The jury subsequently found that Jefferson and Overground each "acted . . . with specific intent to cause harm," assessing $2 million punitive damages against Jefferson and $1 million punitive damages against Overground. Jefferson's motions for judgment notwithstanding the verdict or for a new trial were overruled, and this appeal followed. *Held*:

1. Once a case has been submitted to the jury and a judgment rendered on its verdict, the denial of a summary judgment motion is a moot issue. See *Metromedia Steakhouses Co., L.P. v. Ray*, 219 Ga. App. 716, 717 (1) (466 SE2d 618); *White v. Lance H. Herndon, Inc.*, 203 Ga. App. 580 (1) (417 SE2d 383). Jefferson's first enumeration of error is without merit.

2. In its September 2, 1994 order denying Jefferson's motion for summary judgment, the trial court determined that there was coverage under the policy issued by Jefferson "for the separate and independent negligence of Overground Atlanta as found by the jury in the underlying litigation and as affirmed by the Court of Appeals in *Overground Atlanta v. Dunn*, 191 Ga. App. 188 (1989)." Jefferson contends the trial court erred in granting plaintiff's motion in limine, thereby precluding Jefferson from arguing to the jury that its policy in fact did not cover the personal injuries sustained by plaintiff. Jefferson relies on the recent case of *Continental Cas. Co. v. HSI Financial Svcs.*, 266 Ga. 260 (466 SE2d 4) to argue that no coverage exists for Overground's negligent supervision where the root cause of plaintiff's actual injuries was a battery excluded from coverage by the policy's express "Assault and/or Battery Exclusion Endorsement."[1]

In *Continental Cas. Co. v. HSI Financial Svcs.*, supra, the Supreme Court of Georgia answered a certified question from the United States Court of Appeals for the Eleventh Circuit in a declaratory judgment action brought in the United States District Court. The Supreme Court of Georgia interpreted the following exclusion in a professional liability insurance policy: " 'EXCLUSIONS . . . (Continental) will not pay, under (the) coverage part, for: Any claim arising out of any dishonest, fraudulent, criminal, or malicious act by (an insured) or any of (an insured's) partners, officers, stockholders, or

---

[1] We note that the exclusion relied upon by Jefferson is itself ambiguous. It does not distinguish between the intentional tort of battery, such as is defined at OCGA § 51-1-14 and any of the crimes involving battery as proscribed by OCGA §§ 16-5-23; 16-5-23.1; or 16-5-24. If the bodily injuries sustained by plaintiff were neither expected nor intended from the standpoint of the insured, those injuries constituted an "occurrence" as defined in the policy.

employees.'" Id. at 261. The Supreme Court of Georgia found "that within the plain meaning of the insurance policy, the claims against [two of the partners] for negligence and malpractice with respect to their alleged failure to supervise and mitigate [the third partner's] criminal acts arose out of the dishonest, fraudulent, criminal and malicious conduct engaged in by [the third partner], bringing those claims within the scope of the policy's exclusionary clause." Id. at 263. Jefferson insists that this holding controls the case sub judice in its favor. But the exclusion in the Jefferson policy reads as follows: "Notwithstanding anything contained herein to the contrary, it is understood and agreed in consideration of the premium charged, bodily injuries or death alleged to have been *caused by* ASSAULT AND/OR BATTERY shall not be deemed an accident or occurrence under this Policy and no coverage shall apply hereunder." (Emphasis supplied.)

"Reported cases provide little assistance in interpretation where the language of the documents involved is not the same." *Dunn v. Travelers Indem. Co.*, 217 Ga. 426, 428 (2) (122 SE2d 518). " 'Arising from' does not mean the same thing as 'proximately caused by.' See *Abercrombie v. Ga. Farm Bureau &c.*, 216 Ga. App. 602, 604 (454 SE2d 813) (1995); *Southeastern Fidelity Ins. Co. v. Stevens*, 142 Ga. App. 562, 563-564 (1) (236 SE2d 550) (1977). Instead this [first] contractual term has been held to encompass 'almost any causal connection or relationship. . . .' Id." *Interface Group-Nevada v. Freeman Decorating Co.*, 222 Ga. App. 44, 45 (1) (473 SE2d 573). This is in contrast to a requirement that a specified occurrence (covered or excluded) be "the direct proximate result . . ." of a defined event. Id. The term "caused by" as selected by Jefferson clearly imposes a narrower, more strict causal requirement than merely "arising out of," but "caused by" does not define its own endpoints. Thus, the question for decision in the case sub judice is the precise meaning to be ascribed this indefinite contractual term.

"In construing an insurance policy, the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. Where a provision in a policy is susceptible to two or more constructions, the courts will adopt that construction which is most favorable to the insured." (Citations and punctuation omitted.) *Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, 196 Ga. App. 503, 504 (2), 505 (396 SE2d 541). The construction of "caused by" most favorable to a reasonable person in the position of the insured is that of "direct proximate result," as opposed to "almost any causal connection or relationship." In that event, the exclusion relied upon by Jefferson to argue that no coverage is afforded under its assault and/or battery

exclusion is unavailing. "There may be more than one proximate cause of an injury. [Cit.]" *Dept. of Transp. v. Blair*, 220 Ga. App. 342 (1) (469 SE2d 446). Due to this Court's earlier opinion affirming the judgment against Overground on a theory of direct liability for its independent negligence, the existence of more than one proximate cause of plaintiff's injuries is the law of the case. Thus, in this civil case, the trial court, as well as this Court, would certainly be bound by the previous ruling in *Overground Atlanta v. Dunn*, 191 Ga. App. 188, supra, regardless of whether Jefferson now contends that ruling to be erroneous. See *Caring Hands v. Dept. of Human Resources*, 222 Ga. App. 608, 609 (1) (475 SE2d 660). Moreover, Jefferson is estopped to argue no coverage by its failure to enter a pretrial reservation of rights and pursuing a declaratory judgment action *promptly* after discovering facts indicating the absence of coverage. "Upon learning of facts reasonably putting it on notice that there may be grounds for noncoverage and where the insured refuses to consent to a defense under a reservation of rights, the insurer *must* thereupon (a) give the insured proper unilateral notice of its reservation of rights, (b) take necessary steps to prevent the main case from going into default or to prevent the insured from being otherwise prejudiced, and (c) seek immediate declaratory relief including a stay of the main case pending final resolution of the declaratory judgment action." (Emphasis in original.) *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 140 Ga. App. 215, 216 (1), 219 (231 SE2d 245). Compare *Standard Guaranty Ins. Co. v. Hulsey*, 204 Ga. App. 508, 509 (1), 510 (420 SE2d 54), where that insured did not demand payment until after a void judgment. There, this Court reasoned that "a declaratory judgment action is procedurally available to an insurer seeking resolution of the validity of a claimant's post-judgment demand for *uninsured motorist benefits*." (Emphasis supplied.) Id. In the case sub judice, the trial court did not err in granting plaintiff's motion in limine precluding Jefferson's argument there is no coverage under this policy.

3. It follows that the trial court committed no error in charging the jury that coverage under the policy was not a contested issue, due to the court's pre-trial ruling, nor in failing to give Jefferson's Request to Charge No. 42, to the effect that the negligence of Overground would not negate the effect of the assault and/or battery exclusion relied upon in this case. Jefferson's third and fourth enumerations are without merit.

4. In its sixteenth enumeration, Jefferson contends the trial court erred in denying its motion in limine to exclude purportedly privileged documents that had been ordered produced for discovery after an in camera inspection by the trial court. See *Southern Guaranty Ins. Co. &c. v. Ash*, 192 Ga. App. 24, 29 (383 SE2d 579), approving of this very procedure. The documents here are letters and mem-

oranda written by Jefferson's counsel, who monitored proceedings in the personal injury action and informed William Everding, Jefferson's claims supervisor.

"There are certain admissions and communications excluded [from evidence] on grounds of public policy. Among these are: . . . Communications between attorney and client." OCGA § 24-9-21 (2). "Communications to any attorney or to his employee to be transmitted to the attorney pending his employment or in anticipation thereof shall never be heard by the court. The attorney shall not disclose the advice or counsel he may give to his clients. . . ." OCGA § 24-9-24. Moreover, "No party or witness shall be required to make discovery of the advice of his professional advisors or his consultation with them." OCGA § 24-9-27 (c). "As to violations of law or commission of fraud, however, the protection extends only to communications after the act or transaction is finished. It does not cover communications respecting proposed infractions of the law in the commission of a crime or the perpetration of a fraud. [Cits.] 'The privileged communication may be a shield of defense as to crimes already committed, but it can not be used as a sword or weapon of offense to enable persons to carry out contemplated crimes against society,' frauds, or perjuries. [Cit.]" *Atlanta Coca-Cola &c. Co. v. Goss*, 50 Ga. App. 637, 638 (1), 639 (179 SE 420).

" '[A] prima facie showing that the (communication) was (made) in furtherance of illegal or fraudulent activity is sufficient to secure disclosure. (Cits.) The determination that a prima facie showing has been made lies within the sound discretion of the [trial] court. That determination may not be disturbed on appeal absent an abuse of discretion. (Cits.)' [Cit.] [In the case sub judice], we have made 'our own independent . . . review of the disputed documents and (find . . .) no abuse of discretion in the (superior) court's determination.' Accordingly, the [denial of Jefferson's motion in limine] must be affirmed." *In re Hall County Grand Jury Proceedings*, 175 Ga. App. 349, 351 (3), 352 (333 SE2d 389).

5. Jefferson's fifth and sixth enumerations complain of the overruling of its motions for directed verdict and j.n.o.v. as to plaintiff's fraudulent conveyance claim under OCGA § 18-2-22. The insurer argues that, even if some coverage existed under its policy, plaintiff "Dunn failed to present evidence on each of the elements necessary to prove a fraudulent conveyance." Our review of these enumerations is limited to those specific grounds urged before the trial court in Jefferson's motion for directed verdict. *Grabowski v. Radiology Assoc., P.A.*, 181 Ga. App. 298, 299 (2) (352 SE2d 185).

OCGA § 18-2-22 (2) provides that the following acts by debtors shall be fraudulent in the law against creditors and others and as to them shall be null and void: "Every conveyance of real or personal

estate, by writing or otherwise, and every bond, suit, judgment and execution, or contract of any description had or made with the intention to delay or defraud creditors, where such intention is known to the taking party; [but] a bona fide transaction on a valuable consideration, where the taking party is without notice or ground for reasonable suspicion of said intent of the debtor, shall be valid." But in order for this Code section to apply, "so that a conveyance by an insolvent debtor can be attacked by his creditor, it must be made to appear that the insolvent debtor actually parted with some valuable asset which belonged to him, and which, if title had been retained, might have been subjected to his debts." *S. T. & W. A. Dewees Co. v. Paul B. Carter & Co.*, 190 Ga. 68, 72 (1), 73 (8 SE2d 376). Furthermore, "[t]he legislature obviously did not intend the taking party to be liable for general and punitive damages under OCGA § 18-2-22 based solely upon the fraudulent conveyance without proof of bad faith, actual fraud, or conspiracy on his part." *Kesler v. Veal*, 257 Ga. 677, 678 (362 SE2d 214).

(a) "Choses in action are not liable to be seized and sold under execution, unless specially made so by statute." OCGA § 9-13-57. Compare OCGA § 9-12-80. Nevertheless, such personalty is subject to attachment by a judgment creditor " 'by process of garnishment or by some collateral proceeding. . . .' " *Carmichael Tile Co. v. Yaarab Temple Bldg. Co.*, 177 Ga. 318, 323 (1), 325 (170 SE 294). In the case sub judice, Overground's potential claim against Jefferson for the insurer's alleged bad faith refusal to defend the action is a chose in action subject to being applied to the debts of the judgment debtor. The release and settlement agreement drafted by Jefferson recites that part of its inducement was to compromise doubtful and disputed claims, such as this bad faith cause of action. This forbearance to bring a doubtful claim against an insurer is valuable consideration in the eyes of the law. OCGA §§ 13-3-41; 13-3-42 (c) (2). See also *Wolfe v. Breman*, 69 Ga. App. 813, 816 (1), 817 (26 SE2d 633). Consequently, Jefferson's contention that, in order to make out a case of delaying or defrauding creditors under OCGA § 18-2-22 (2), plaintiff must also show that Overground had indisputable *contract* rights under the policy is without merit.

(b) "The question as to whether the [release in the case sub judice] was executed by [Overground] with intention to delay or defraud [plaintiff] in the collection of [his $1 million tort judgment] and such intention was known to the [releasee, Jefferson], or whether the transaction was a bona fide one upon a valuable consideration and without notice or ground for reasonable suspicion, is ordinarily one for determination by a jury. [Cits.]" *Lewis v. Lewis*, 210 Ga. 330, 332 (2) (80 SE2d 312). "Mere inadequacy of consideration alone will not void a contract. If the inadequacy is great, it is a strong circum-

stance to evidence fraud. . . ." OCGA § 13-3-46. Even "inadequacy of price alone is not sufficient to set aside a conveyance unless the inadequate price, taken in connection with other circumstances of a suspicious nature, raises 'such a vehement presumption of fraud.' . . . [Cits.]" *Durrence v. Durrence*, 267 Ga. 280, 282 (476 SE2d 741).

Here, Overground's intent to delay and defraud plaintiff as alleged in the complaint was admitted by its default, but that default is not binding upon Jefferson, who appeared and contested liability. See *Kubler v. Goerg*, 197 Ga. App. 667, 671 (4) (399 SE2d 229). Nevertheless, the correspondence and memoranda authorized the jury to conclude that Jefferson orchestrated the entire transaction, including coaching Overground's attorney to opine the policy afforded no coverage, after Jefferson agreed to pay counsel's unpaid legal fees, $5,500.

This small sum, under the circumstances, represents 11 percent of the $50,000 policy limits; 0.022 (twenty two/one thousandths) of one percent of the $250,000 compensatory portion of the personal injury judgment; and an infinitesimal 0.0055 (fifty five/ten thousandths) of one percent of the $1 million principal sum of the personal injury award. Consequently, this very great disparity between the judgment debt and the consideration received by the debtor in exchange for releasing its insurer "could enter into the question of fraud." *First Nat. Bank &c. v. Kelly*, 190 Ga. 603, 607 (7) (10 SE2d 66). Jefferson's undisputed leading role in formulating the plan to obtain a release from Overground before plaintiff obtained an assignment of Overground's sole asset, its claim against Jefferson, is additional evidence that the release was intended by Jefferson to delay plaintiff in collecting or otherwise defraud him of *any* satisfaction of his $1 million personal injury judgment. The execution of the release was but a few short weeks after this Court affirmed the judgment against Overground. "The proper rule is that the judgment should be affirmed if there is any evidence to support it unless it can be said as a matter of law that there was a reasonable defense which vindicates the good faith of the insurer. A refusal to pay in bad faith means a frivolous and unfounded denial of liability. If there are any reasonable grounds for an insurer to contest the claim, there is no bad faith." (Citations and punctuation omitted.) *Canal Ins. Co. v. Savannah Bank &c. Co.*, 181 Ga. App. 520, 523-524 (5) (352 SE2d 835). In the case sub judice, we have already determined that Jefferson is estopped to deny coverage because it failed to seek a declaration of its rights and responsibilities *promptly* upon learning of facts that would indicate no coverage. Moreover, the assault and/or battery exclusion consistently relied upon by Jefferson would not be a valid basis for denying coverage and refusing to defend its insured against allegations of false imprisonment and malicious prosecution. The record supports a determination that Jefferson "failed to estab-

lish a reasonable ground for contesting the claim and thus, had acted in bad faith in refusing to make payment [and in refusing to defend its insured]." Id. at 523 (5), 524. The trial court did not err in overruling Jefferson's motion for directed verdict and in denying its motion for j.n.o.v. on the ground that the evidence failed to make out a case under OCGA § 18-2-22 (2).

6. In a related enumeration, Jefferson contends the trial court erred in submitting the issue of punitive damages to the jury, arguing that the award of punitive damages is based solely on circumstantial evidence which was "directly contradicted by direct evidence. . . ." "It is [however] clear that [since] there is evidence of bad faith . . . [and] conspiracy on the part of [Jefferson as] the taking party or transferee in receiving assets fraudulently conveyed to [it] by [Overground as the judgment] debtor, an award of general and punitive damages against the transferee may be upheld." *Lawson v. Athens Auto Supply &c.*, 200 Ga. App. 609, 611 (2) (409 SE2d 60).

7. The next evidentiary objection is that the trial court erred in allowing plaintiff to argue the merits of any bad faith claim without first requiring a proper foundation.

"The order of presentation of evidence is a matter that rests within the trial court's discretion which will not be controlled unless abused. [Cits.]" (Punctuation omitted.) *McKinney v. State*, 218 Ga. App. 633, 636 (4) (463 SE2d 136). Although Jefferson argues that Overground could not effectively assign its bad faith claim against the insurer to a third party (even a judgment creditor), so that plaintiff had no claim to pursue, this position begs the question whether the release of that bad faith claim to Jefferson was intended to delay or defraud the judgment creditor. That is a question of Jefferson's intent based on its undisputed knowledge of events. Moreover, except where the contract involved is within the purview of Title 11, "all choses in action arising upon contract may be assigned so as to vest the title in the assignee. . . ." OCGA § 44-12-22. And "[e]xcept for those situations governed by Code Sections 11-2-210 and 11-9-402, a right of action is assignable if it involves, directly or indirectly, a right of property. A right of action for personal torts or for injuries arising from fraud to the assignor may not be assigned." OCGA § 44-12-24. " 'After (a) loss, the claim of the insured, like any other chose in action, could be assigned without in any way affecting the insurer's liability. . . .' *Georgia Co-Op. Fire Assn. v. Borchardt & Co.*, 123 Ga. 181, 183-184 [(2)] (51 SE 429) (1905)." *Santiago v. Safeway Ins. Co.*, 196 Ga. App. 480 (1) (396 SE2d 506). Compare *Owens v. Allstate Ins. Co.*, 216 Ga. App. 650, 651 (1) (455 SE2d 368) (physical precedent only) with *Southern General Ins. Co. v. Holt*, 262 Ga. 267 (416 SE2d 274). This enumeration is without merit.

8. Jefferson's fifteenth enumeration assigns error to the admis-

sion into evidence of opinion testimony regarding the elements of a bad faith claim against an insurer generally and the specifications of bad faith against Jefferson in particular. Jefferson complains that it objected no fewer than 13 times on the basis that James Edward O'Malley, Jr. should not be allowed to give legal conclusions as to whether Jefferson's actions constituted bad faith.

O'Malley was qualified as an insurance claims-handling expert without objection "other than [defense counsel's] earlier objection about the opinions." After initially overruling an objection, in the nature of "best evidence," as to O'Malley's testimony about the duties of an insurance company, the trial court eventually sustained this same objection and ordered plaintiff's counsel to rephrase the question. The trial court then sustained objections as to inadequate foundation, testimony "beyond the scope of [O'Malley's] qualifications," and that it amounted to a "legal conclusion." The trial court next ruled that O'Malley would be permitted to testify "about the standard of care," but sustained Jefferson's objection to O'Malley's opinion that Jefferson "should have done some investigation and taken up the defense . . . of their policyholder," based on the allegations of the amended complaint. The trial court further sustained Jefferson's objections to the form of a hypothetical question. After another objection on the basis of legal conclusion, the trial court clarified its rulings by agreeing with Jefferson that "ultimately whether or not there is coverage is a legal question . . . and it's not for [the witness] to answer, but [he may testify as to] how he would or how a person exercising the customs and practices of the industry would react. . . ."

Thereafter, over the same objection, O'Malley testified that he would have first sent a reservation of rights letter to the insured, informing them of the possibility of some defense to coverage but that the insurer would nevertheless "take up the defense in the matter." Upon receipt of the offer to settle for the policy limits, O'Malley would have "looked into it and probably started some settlement negotiations." O'Malley was further permitted to opine that it was "not within the custom and practice of the industry, not to do anything." The failure to negotiate with the plaintiff's attorney "would fall without — outside of the customs and practices of the industry. . . ." The trial court struck a reference by O'Malley to unnamed duties imposed by "some state statutes. . . ." Over objection, O'Malley was permitted to testify that "it's in bad faith for them [the insurer] not to investigate it and to enter into some kind of negotiations with the attorney at that time." Defense counsel was then granted a continuing objection to "the whole line of questioning." O'Malley then testified that, in his opinion, Jefferson "acted in bad faith" when it chose not to settle within the policy limits and expose its insured, its policyholder, to this excess verdict.

As can be seen from this lengthy recitation from the record, the trial court's rulings were substantially the grant of relief whenever the questions posed would lead the witness into invading the province of the jury. As to Jefferson's continuing objection that an expert may not testify that certain circumstances were, in his opinion, indicative of the insurer's bad faith, we note that a pivotal question posed by this case was "whether the jury was authorized by the evidence to find that the insurer violated any duty to the insured in failing or refusing to accept the offers of settlement." *U. S. Fidelity &c. Co. v. Evans*, 116 Ga. App. 93, 94 (2) (156 SE2d 809), aff'd, 223 Ga. 789 (158 SE2d 243). In the case sub judice, expert testimony of the standards, practices and customs of the insurance business was legally relevant, by virtue of Jefferson's predicating its "good faith" refusal to pay upon the assertion that no investigation or settlement discussions were warranted because of the assault and/or battery exclusion. Thus, Jefferson "itself rendered expert testimony as to the underlying . . . viability of that [assertion] potentially relevant and admissible evidence. See generally *Stewart v. State*, 246 Ga. 70, 75 (4a) (268 SE2d 906) (1980)." *Intl. Indem. Co. v. Coachman*, 181 Ga. App. 82, 84 (1), 85 (351 SE2d 224). We find no error in the evidentiary rulings of the trial court.

9. The trial court did not err in charging the jury that an adverse inference may be drawn by a party in a civil case who invokes a testimonial privilege. "[A]lthough a person does have a right to invoke the privilege[s] [under OCGA § 24-9-27] in a civil case in order to protect himself, when he does so, an inference against his interest may be drawn by the factfinder." *Simpson v. Simpson*, 233 Ga. 17, 21 (209 SE2d 611). Accord *Ostroff v. Coyner*, 187 Ga. App. 109, 115 (4), 116 (369 SE2d 298). The seventeenth enumeration is without merit.

10. The fourteenth enumeration contends the trial court erred in allowing plaintiff's counsel to argue repeatedly during the punitive damages phase, over objection, that Jefferson should be punished for its conduct in all 50 states.

When confronted with allegedly improper argument, counsel is "authorized merely to object *on stated grounds* and thereby implicitly request that the trial court acknowledge the impropriety of the closing argument by sustaining the objection thereto." (Emphasis supplied.) *Garner v. Victory Express*, 264 Ga. 171, 172 (2) (442 SE2d 455). In the case sub judice, Jefferson interposed the following objection: "Your honor, I don't think this is proper argument, I'd object." The next was: "I object to that, Judge."

"This court has held that a mere objection to an unwarranted and prejudicial argument, without more, is not sufficient to properly invoke a ruling by the [trial] court. See *Lenox Drug Co. v. New England Jewelry Co.*, 16 Ga. App. 476 (5) (85 S.E. 681), and cita-

tions." *McCoy v. Scarborough*, 73 Ga. App. 519, 524 (6) (37 SE2d 221). In the case sub judice, Jefferson's bare objections to allegedly improper argument were entirely too vague and general to invoke a proper ruling by the trial court. Consequently, this enumeration presents nothing for review.

11. Remaining enumerations of error have been carefully considered. There is no merit in enumeration of error seven to the exception involving the charge as given. Nor has Jefferson demonstrated any error in the failure of the trial court to give the enumerated requests to charge. Under the law of the case, the requested instruction on the effect of the insurer's assault and/or battery exclusion on negligence claims is not an accurate statement of the law and so the fourth enumeration is without merit. " 'A party is not entitled to have all of his requested charges given merely because he requests them.' *Lenny's Number Two v. Echols*, 192 Ga. App. 371, 374 (3) (384 SE2d 898)." *Ploof Truck Lines v. Bennett*, 221 Ga. App. 789, 790 (1) (472 SE2d 552). "The jury was otherwise instructed on the [applicable] legal principles contained in [Jefferson's] refused requests to charge. Accordingly, the failure to give those refused requests was not error. *Lenny's Number Two v. Echols*, 192 Ga. App. 371, 374 (3)[, supra]." *Daniel v. Parkins*, 200 Ga. App. 710, 713 (7) (409 SE2d 233).

*Judgment affirmed. Johnson and Ruffin, JJ., concur.*

DECIDED FEBRUARY 7, 1997 —
RECONSIDERATION DENIED FEBRUARY 20, 1997 —

*Hawkins & Parnell, H. Lane Young II, Kimberly A. Houston Ridley, Thomas G. Tidwell, Edward C. Henderson, Jr.*, for appellant.

*Webb, Carlock, Copeland, Semler & Stair, Thomas S. Carlock, David D. Cookson, Nickerson & Tuszynski, Thomas H. Nickerson, David E. Tuszynski*, for appellee.